# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
12/13/2021
**JEFFREY P. COLWELL, CLERK**

Civil Action No.  _____

(To be supplied by the court)

ABADE IRIZARRY
ERIC BRANDT

Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, a municipality;
BRET GAREGNANI, in his individual capacity,
DARKO LUKAJIC, in his individual capacity,

Defendants.

*(List each named defendant on a separate line.  If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names.  The names of the defendants listed in the above caption must be identical to those contained in Section B.  Do not include addresses here.)*

_____

## COMPLAINT

_____

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files.  Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number.  A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

---

**PLAINTIFF INFORMATION**

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

Plaintiff #1: Abade Irizarry

Plaintiff #1: Abade Irizarry 11452 County Road B., Manzanola, CO  81058.

(Name and complete mailing address)

720-329-8457

(Telephone number and e-mail address)

#Plaintiff #2: Eric Brandt

Eric Brandt is a United States Citizen and a resident of Colorado.  Brandt is presently incarcerated at Bent County Correctional Facility 11560 County Road Ff. 75, Las Animas, CO  81054 Inmate ID #191131.

(Name and complete mailing address)

N/A

(Telephone number and e-mail address)


**B.    DEFENDANT(S) INFORMATION**

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B.  DEFENDANT(S) INFORMATION."*

Defendant 1: Bret Garegnani   9206 Ingalls St, Westminster, CO 80031.

(Name and complete mailing address)

N\A

(Telephone number and e-mail address if known)


Defendant 2:    Darko Lukajic   490 W. Colfax Ave., Denver, CO 80202.

(Name and complete mailing address)

N/A

(Telephone number and e-mail address if known)


Defendant 3:    City and County of Denver   Offices located at 1437 Bannock Street, Denver, CO 80202; Van Cise-Simonet 490 West Colfax Ave., Denver, CO 80204; Lindsey

Flanigan Courthouse 520 West Colfax Ave., Denver, CO 80204; Webb Municipal Building, 201 W. Colfax Ave., Denver, CO 80202.

(Name and complete mailing address)

   720-865-2790

(Telephone number and e-mail address if known)

Defendant 4:   _____

(Name and complete mailing address)

_____

(Telephone number and e-mail address if known)

## C.   JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

   X   Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

   List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

   28 U.S.C. § 1391 (b),  42 U.S.C. § 1983, 42 U.S.C. § 1988.

_____

_____ Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of _____.

## PARTIES

At all times relevant to this complaint, Plaintiff was a citizen of the United States of America and resident of the State of Colorado.

Defendant City and County of Denver ("Denver") is a Colorado municipal corporation. At all times relevant to this complaint, Defendant Bret Garegnani was a citizen of the United States and a resident of the State of Colorado who was acting, in his individual capacity and also under color of state law in his capacity as a law enforcement officer employed by Denver.

10. At all times relevant to this complaint, Defendant Darko Lukajic was a citizen of the United States and a resident of the State of Colorado who was acting, in his individual capacity and also under color of state law in his capacity as a law enforcement officer employed by Denver.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____Yes_____.

If Defendant 2 is an individual, Defendant 2 is a citizen of _____Yes_____.

Defendant 1 is incorporated under the laws of _____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____ (name of state or foreign nation).

(*If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant*.)

### D.   STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF*

*CLAIMS."*

CLAIM ONE: _____

### Supporting facts:

### REFERENCED DOCUMENTS CENTRAL TO INSTANT COMPLAINT

1) Event Recordings: Non-Party Kyle Shockley Live-Streamed this incident from outside the building on his YOUTUBE Channel "Munkay 83", Video Titled "

2) The Shockley video begins several seconds before the relevant events and terminates shortly after the end of the first interaction (removal).

3) Plaintiff Abade Irizarry noticed Plaintiff Brandt having an interaction with Defendant Garegnani and out of an abundance of caution predicated on past misconduct by Garegnani, initiated a static recording (Locally stored as opposed to Live-Streamed over a Network) on his smartphone device and approached to within several feet.

4) Irizarry's recording begins about

5) Minute and

6) Seconds after Shockley's recording, and continues until after the events of the first encounter.

7) Caryn Sodaro was present for both contact events (Removal #1, #2 Trespass). Sodaro, who has a very long-established history involving Denver Law Enforcement generally, and Defendants Garegnani and Lukajic specifically, also started recording on her smartphone device.

8) Sodaro's recording begins about Minutes and Seconds after the Shockley recording, and continues until after the events of the first encounter. Together, these three overlapping recordings constitute the best objective evidence of the first contact event supporting Plaintiffs' factual allegations, and especially contradicts allegations and statements asserted by Defendants.

## FORUM

9)     The interior lobby of the Lindsey Flanigan Courthouse is a Non-Public forum.  Non-Public

Forum restrictions on speech must be reasonable and viewpoint neutral.

10)     Reasonable time, place or manner restrictions must be viewpoint neutrally, and must be

narrowly tailored to serve a legitimate content, viewpoint neutral interest.

11)     Access to a Non-Public Forum may only be restricted so long as restrictions are reasonable

and not an effort to suppress expression because Officials oppose the speaker's viewpoint.

12)     Plaintiffs Brandt and Irizarry had a well established right to be present and access the

open-to-the-public Courthouse.

13)     Plaintiffs conduct did not unduly interfere with the functions of the Courthouse. Garegnani

and Lukajic targeted Brandt and Irizarry's particular viewpoint on an otherwise expressly and

affirmatively permissible subject matter.

14)      Caryn Sodaro was permitted to criticise and insult Garegnani personally, verbally on the

condition that she not yell; she did so repeatedly.

15)      Johna Solis was permitted to repeatedly criticize and insult Garegnani directly.

16)      Alan Moody was permitted to yell, curse at Garegnani repeatedly, and create an actual

disruption.

17)      Criticism of Deputy Garegnani was a permissible subject matter.

18)      Brandt was explicitly affirmatively permitted to direct viewpoints commonly understood

to be supportive, commonly understood to be supportive or positive of Garegnani (thumbs-up,

pinky-up, index-up, pointer-at).

19)      Both Garegnani and Lukajic, at various points, used hand gestures to communicate

messages to Plaintiffs, to wit: Gestures plainly understood to convey messages such as "go that

way", and others.

20)      Communicative speech through the use of silent hand gestures was a permissible manner

and form of speech.

21)    Defendant's restriction on Plaintiff's speech did not constitute any reasonable content or viewpoint neutral time, place or manner restriction narrowly tailored to any legitimate Government interest.

22)    No Law or Regulation existed which would permit the restriction by Defendants of the specific message conveyed by Plaintiffs directing a middle-finger gesture at Garegnani or other Officers.

23)    Defendants censored Plaintiffs' speech not because of the subject matter, but impermissibly because of the viewpoint expressed which they erroneously believed to constitute an "Obscene" gesture.

24)    Garegnani expressly stated that free speech was "definitely allowed" in the Courthouse Lobby at this time and location.

25)    The commonly known traditional historic use of the Courthouse corridors is to permit a wide variety of speech subjects and forms of speech to include speech regarding political opinions regarding performance or opinion of Officers and hand signed language and other non-disruptive symbolic speech.

26)    Silent or symbolic speech in Courthouse corridors, without more, has been protected speech since 1971 in 403 U.S. 15 Cohen v. California.

27)    Plaintiffs did not present any risk "beyond what was previously tolerated"-or that was tolerated, in fact, at that same time and location.

28)    "It would be a rare person who would be 'turned on" by the conduct at issue here [middle-finger gesture].  However, it is not sexual in nature.  Rather, the conduct is intended to express disrespect for and to offend the Police Officer."

29)                        -Brockway v. Shepherd, 1996

30)   "No matter how you slice it, the crude [middle-finger] gesture could not provide justification for Fourth Amendment Seizure"

        -Cruise-Gulyas v. Minard

31)   "This ancient gesture of insult is not the basis of a reasonable suspicion of criminal activity"

32)          -Swartz v. Insogna, 2013

## CITY OF DENVER MONELL LIABILITY

33)   The city and country of Denver has Long-standing, well-entrenched, customs, practices and in some instances actual written policies to commit violations of citizens' rights in the manner and of the genes described throughout this complaint.

34)   Plaintiff has compiled a database of over 60 events dating back to 2009 in which he has classified the events grouping them into numerous relevant categories.

35)   There is known to exist recorded footage in at least 83% of these incidents.

36)   Plaintiff asserts improper, retaliatory motives to be substantial or sole driving forces behind each incident in at least 84% of the list.

37)   In at least 45% of these events, action involving Denver's treatment of the homeless immunity can be directly connected.

38)   In at least 44% of these events, official action in direct response to insults directed at law enforcements, 78% of these involve the word "FUCK".

39)     Of the events compiled, the word "FUCK" is a motivating factor 39% of the times.

40)     37% of events occurred on, or were directly related to the 16th street mall and members of the Downtown Denver Business Partnership, (The key player in the drafting, lobbying, passage, and enforcement of the legislative suite known as "The Urban Camping Ban" that criminalizes the homeless)

41)     Opposition and retaliation attributed directly to the presence and use of citizen cameras exist in at least 35% of instances.

42)     Alarmingly, citizen created recordings memorialized events which directly exposed fraud and falsehood committed by public officials, departments and/on officials in an astonishing 21% or more of compiled events.

43)     Also distressing is the directly improper use of "CIVILIANS" as a vehicle to "Probable cause" employed to try to "legitimize" retaliatory adverse actions in 18% of interactions.

44)     Besides categorical classification such as listed above, Plaintiff's compilation also illuminates a pattern of involvement of key law-enforcement officials.

45)     Of particular relevance to the instant matters is the verifiable direct personal involvement of defendant Lucero in at least 10% of events, and defendant Chavez in a Staggering 29%!

46)     Upon information and belief, Chavez is actually involved in much more, but this 29% figure is only based upon evidence already known to plaintiffs.

47)     That's a high-ranking lieutenant with the single largest of the six districts within the city of Denver (District 6) would be personally involved in 29% of events compiled is astounding.

48)     Even more astounding is that in the eleven years of the study (2020 – 200 = 11 years), direct involvement be Chavez does not become apparent in plaintiff records until 2018!

49)     And it is almost unbelievable that 72% of all Chavez interaction involve Brandt (Plaintiff) and/on Loma (Brandt's associate arrested in the incident with him).

50)     Chavez is ultimately involved in 80% of all events (18of 48) compiled since 2018 - The cost of two to eleven years!

51)     Other patterns of officers involvements also emerge through which deep rooted animus against plaintiffs and his associates, and well routed custom to retaliate against them emerge.

52)     In fact, patterns emerge targeting not only individuals (Loma: 22%), (Brandt: 45%), (Sodano: 27%), but also class discrimination (Citizens who record), (Occupy Denver), and (The right /wrong king of protesters where according to at least 3 judge, extinction rebellion" and the right protesters, and "Occupy" and the wrong ones).

53)     For brevity of complaint, not all of the more than 60 events are described in this complaint, however many are out forth which are other most acuminating to show liability to this suit.

54)     It must be noted that Denver's misconduct is not strictly limited to plaintiffs; the list compiled exposes at least sixteen (16) different victims of Denver abuses, which involve at least dozens of different officials.

55)     Some of the enumerated events occur well after the events of the instant matter, and are put forth herein to demonstrate the on-going and imminent threat of further abuses against plaintiffs, or members of various classes of individuals.

56)     On 2020, Mancry Bordovsky testified in a hearing involving dozens of email records, the city provided responsive to Suproena by Brandt's response council. The Suproena dices tecum compelled the city to produce records. Responsive to the question of city attorney emails related to Eric Brandt and Brian Loma the court reviewed these records in camera and found many of them relevant to the  questions raised by the Drazen_Smith email of 2019 maroy. As such, this court permitted plaintiff and his council to examine those records, but snorted their contents to be viewed only ad never in Brandt's possession. Furthermore, Judge Jackson forbade Brandt from taking notes from or publically discussing their contents while plaintiff cannot consistent with that order regarding the criminal prosecution. He can and certainly does assert, upon information and belief, supported by the judges own record made in open could that the city did produce a create number of records, it felt were responsive to the submenu and the judge did find many of them to be of sufficient merit in gagged circumstances. It was Kristin Browsow    who produced and defended these records.

57)     On 2015 Sep___, while engaged in a 24/7 protest at the courthouse plaza, DPO conducted yet another of some 2 dozen raids in the middle of the night. Brandt stood by the slog poles chanting "Fuck the Police" and holding a "Fuck cops" banner. SGT Connon had Brandt arrested and charged with obstructing police, claiming Brandt had approached the officer to interfere with an arrest. During motions hearing, Connon testified that halo footage had been preserved, but never provided to defense. Miraculously, the city Atty suddenly "Found" the video, which evidenced that Brandt had in fact never interfered. Brandt subsequently prevailed on the changes. (1DX 11)

58)     On 2018 July 05, Susan Greene was arrested for photographing police. (See 4____) when she asked "Are you fucking kidding me", the officers told her to "Act like a lady". This obtuse and chauvinistic conduct obviously because the officers were offended by the word "Fuck" (IDX 15)

59)     On 2018 Sep 23, Brain Loma was arrested after saying "Fuck the Police" and "These fuckers" by SGT Guzman, with the concurrence of defendant Chaver (See 9____), (IDX 17).

60)     Also on 2018 Sep 23, Mikel Whitney was also arrested ny Guzman for "cussing in public" for saying "I did not take a fucking picture" (IDX 18)

61)     Both Loma and Whitney had their aforementioned charges dismissed in 2019 Jan. Both filed 1983 claims through Kilmer, Cave and Guzman case no 20 _cv_ 02827

62)     The following day (On 2018 Sep 24) while protesting the sodaro , Loma and Whitney arrests 23 Sep, Brandt was carrying a large "Fuck cops" flag and chanting "Fuck the police" while flipping off a group of DPD officers many of  whom had been involved in the previous days arrests. CPC Kitchens announced "unfortunately, we as police officers cannot be offended but if a private citizen would like to sign a complaint, I will be happy to arrest him". One ……. Brandt was arrested. Brandt's charges were dismissed within the week, although it would be months before Loma and Witney would see belief. Defendant Chavez was also among of and endorsed this arrest. The fact the city Atty office immediately dismissed this case is yet more evidence the city knew there was substantial risk officers would retaliating for insulting speech, it is also obvious Denver police are aware insulting the police was protected speech, but they mistakenly believed and still believe that if a private citizen is "defended", then they can circumvent the law and retaliation. This is the same ignorance of the law at the core of the instant matter.(IDX 19)

63)     On 2018 Sep 30, Abade Irizarry was filming DPD Guzman, CPUL Chavez and other DPD officers harass an eloping man for smoking when they kicked his cane from under him, Mizarry spoke up and insulted them, CPL Chavez Belly-bumped Irizarry repeatedly (See 9_____) IDX 25

64)     On 2018 Nov 04, Brandt insulted CPL Chavez who was once again performing his sigmatung "belly bump" moves . Chavez went berserk.

65)     Following the 2018 Nov 04 Chavez incident, SGT Guzmen, began targeting Brandt and his associates very aggressively as a result they responded with more insulting process. Guzmen diverted enormous resources to escalating his conduct. These incidents are grouped by plaintiff together as "The Guzman Series" and indexed as

66)     2019 Feb_____ several activists watching a security worker assault Brain Loma on his live stream responded by showing up and commencing protest including "Fuck the police" officers RD. Smith cited Loma instead of his Insresor not knowing Withney Bonnie was actually Loma's associate, he let slip to her that Loma "would not even be getting a citation if Eric Brandt and his crew had not showed up to make a scene" (See 9_____)(IDX 33)

67)     On 2019 Jun 02, Kyle Shockley was video recording Abade Mizarry demonstrating in the public plaza (Wynkoop Plaza) speaking out against Denver's treatment of the homeless and DPS's treatment specifically Union Station Security, Keola Slater Called 911. Officer Insersor arrived and saw Irizarry demonstrating. Union Security Scott Webber told Insersor Mizarry and Shockley had used the word "Fuck" on a public sidewalk being well-established as protected speech, Insersor arrested them both charging them with trespass and disturbing the places. Both Irizarry and Shockley filed 1983 claims via council Milo Schwab (IDX 40)

68)     On 2019Jun_____, while downtown with several other associates for sail support activities and the Noles family Brandt travel to eleven at 15th and court when is located across the street imposed by the city Attorney (See [IDX 39, 36, 35, 33] As thus issue is central to thus suit). Two DPD motorcycle cops , Tinnan and CPL Moore (See also IDX 34- Westbrock and IDX 19 - Cosgriff) with whom Brandt has endorsed Cong-standing abuses, rode pass Brandt while he was live streaming his travel. Brandt flippled them off and shouted "Fuck you". As they rode pass. When Brandt and the noles returned to the detention centre, Brandt was surrounded by Tinnan, Moore, defendant Chavez and others and arrested on the charge of violation of a restraining order – area restrictions, Brandt was not in violation and his own video proved it. The charges were eventually dismissed. (IDX 44)

69)     On 2019 Jul 22, Kyle Shockley was live-streaming DPD harassing Caryn Sodaro on the 16th street mall when R.D Smith arrested him for disorderly conduct (for which he having not engaged in disorderly conduct was not actually charged). While being transported by R.D Smith to a holding cell, Shockley asks Smith "Do you know Eric Brandt?" to which he got no response. Shockley then said; "Well, do ya punk? Enjoy all the phone calls!" Smith charged Shockley with a felony "Attendant to influence a public servant by threat and coercion". These retaliatory felony charges were dismissed a couple weeks later. Shockley's cell phone seized as evidence was to be returned to him on the event giving rise to the instant matter 2019 Aug 07. (More R.D. Smith /Brandt interaction, See [IDX 33] above)(IDX 45)

70)     2019 Jul 15, Caryn Sodaro heckled the mayor over his treatment of the homeless during his reflection inauguration, defendant Kenneth Chavez personally arrested her. Despite many other hecklers at the event, Sodaro was the only person arrested. Brain Loma was live-stream recording the event. Moments prior to Chavez arresting Sodaro, Loma happened to be standing next to a

group of officers where he captured Chavez instructing them that "occupy" was up by the barriers and if any of them makes a peep-arrest them. (IDX 47)

71)     On 2019 Aug 07, Wwhile accompanying Shockley to DPD headquarters to recover his cell phone (See 9 {IDX 45}), Brandt was arrested and charged with disorderly conduct fir allegedly calling H.S.S security Suazo Beverly Rodrkvez a "Snitbag". This incident is covered in detail elsewhere as it is the foundation of that instant matter. [IDX 49]. Even if the allegation had been true when it has not, it would not have constituted "Fighting words". It clearly demonstrates Denver's deep-rooted practices of criminalizing mere insults.

72)     2019 Sep – Dec, Myriad instances of DSD Brett Sargsnani cracking down on long-time detractors Janet Matzen, and Caryn Sodaro. Each had, for years, been objected to Sargsnani's killing of immate Michael Manshall, for which the city paid a record 9.7 Million dollars to Marshall's Samky and Garegnani got off scott-free. Abusing a new joint order (JO/9-1), claiming the middle –finser gettune was in violation of the state's harassment by obscurity statute (18 – 9 – 111(1)(6)), he began ejecting the women, others responsive by flipping him off at various times for which they were also expected (Moody, Irizarry), in one instance, Irizarry was ejected for displaying merely an image of a cartoon depiction of a middle finger on his cell phone, and Garegnani expected of him. Then on 2019 Dec 11, Brandt recording this abuse is being shield by a lack of recording ability (DVE to 2019cAug 09 recording ban JO 19-2) Brandt asked Shockley to record from outside through the window. Brandt stands out of the way under docket monitors and in clear view of Shockley's live-streaming and extends a middle finser gestune at Garegnani. Garegnani advises (incorrectly) that the gestune is illegal and instructs Brandt to "Put that away," Brandt asks if several other fingers are allowed, such as Pinky Finser, Index finger, pointing at and also thumbs-up. Each of these other benign of else supportive gestures were allowed, but the

insultive gesture was not. Brandt, knowing the gesture was not "obscene" by legal definition resumed his gesture, and Garegnani physically fricked Brandt out. He then called Irizarry out for the same reason. Later when Brandt returned after his lawyer added him to the docket, Garegnani would not allow Brandt in falsely claiming he had informed Brandt he could not return (A fact proven by two independent recordings captioned by Sodaro and Mizarry unbeknownst to Brandt), Garegnani convinced Defendants Lucero and Chavez to arrest Brandt the following morning, without a warrant on the charge of trespassing. Additionally, a separate prosecution was commenced in a YouTube video where Brandt had warned Garegnani a few weeks earlier that "You're going to get a lot of middle finsers". These numerous instances are indexed by Plaintiff as (IDX 52, 53, 54, 55, 56, 60, and 76). It should be noted also that a warrant was issued for trespass against Caryn Sodaro as well, who not only had Consented to Garegnani, but also called Garegnani "A fucking fat murderer pig" during the incident, he claimed she was kicked out for recording which, because she in fact was recording, she could prove he never kicked her out for it (See 9____ [IDX 60])

73)   On 2019 Dec 29, Garegnani violently arrests Moody after mocking him for his deafness (See9____[IDX 56, 57 (BRAMF)]). The group was heavily infiltrated by undercover DPD officers. Irizarry noticed a man who just screamed "undercover". He called the man out saying "Nothing cooks more like an undercover, than an undercover!" he was in fact, discovery revealed the man actually protested defendant Chavez body camera on him! Then, after the moody arrest, Irizarry instructed the myriad officers but not too boisterously deputies ordered Irizarry   out of the DPD surrounded him the intersection and arrested him (IDX 58)

74)   Handily an isolated incident on 2020 May ___Winston Noles was captured on video by social media journalist John Reed (Ghost writer - YouTube) protesting police near the state capital

(Lincoln and 13th ST intersection). Noles shouted out: "Bad cops are poops! And the good cops that protect bad cops are also poop! That means all cops are poops!" multiple DPD officers turned their riot weapons on Noles and pelted him with rubber bullets and pepper ball. All captured on Reed's video (IDX 63)

75)    On 2020_____, John Reed was again downtown capturing the post-Floyd protest when his camera captured a man and his pregnant wife driving down Colfax when they flipped off several officers and shouted "Fuck the police". Denver police focussed their riot weapon directly at the couple and pelted them rubber bullets, paint balls, pepper balls, etc. All captured by Reed's live-stream (IDX 63). This appalling incident footage was picked up by maiw- stream media as an outrageous continuing example that Denver has no intention of relinquishing the power they enjoy punishing citizen s who insult them even when they are being recorded, and despite the "first amendment training bulleting".

76)    It is clear Denver's customs and practices constitute the city's De facto policies which clearly supplant the written "informal" policies to the contrary.

77)    These 28 incidents indexed here are by no means an exhaustive list-sadly.

## 18-9-111 (1)(b)

## AS APPLIED IS UNCONSTITUTIONAL

78) Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

79) 18-9-111(1)(b) Cannot be Constitutionally applied to Brandt or Irizarry because the Courthouse is not "A Public Place" as a matter of State Law. 18-9-111(1)(b) Expressly limits liability to "a Public Place":

80) 18-9-111-Harassment (EMPH Added)

81) A person commits harassment if, with intent to harass, annoy, or alarm another person, He or She;  (b)  directs obscene language or makes an obscene  gesture to or at another person;

82) § 18-9-110 Public buildings trespass/interference expressly prohibits certain conduct inside public buildings.   Because "Public Buildings' were specifically addressed in 18-9-110 "A Public Place: does not apply to spaces inside public buildings.(see 864 F.Supp 1013 U.S. v. Wright O. Cozo 1994 & A "Public Building" is not a Public Place" within the meaning of the Statute because 18-9-110 is governing).

83)      Defendants "cannot rely on their ignorance of even the most esoteric constructs of the Law."

84) Defendants Garegnani and Lukajic seek to invoke 38-115 Denver Revised Municipal Code-Trespass, by falsely claiming that Garegnani told Plaintiffs they could not return to the Courthouse that day, thus conjuring up the falsehood that Brandt and Sodaro acted "knowingly."

85)    38-115 D.R.M.C. provides, in relevant part:

86) (a.) It is unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof..

87)    Because Garegnani did not, in fact, advise either one of them that they could not return.

88)    Furthermore, because Plaintiffs had a clearly established right to be present inside the Courthouse, unless they had engaged in conduct which violated a Law or Regulation, Defendants did not have the Lawful Authority to exclude them.

89)   Even if Garegnani had told Plaintiffs they could not return, (which he did not), such an Order would have been unlawful.

90)   Despite the lack of Lawful Authority to exclude Brandt and Sodaro, each of them nevertheless immediately left as soon as Garegnani told them they would be arrested for Trespass if they did not.  Thus, as soon as Garegnani made it clear that consent to enter was withdrawn, they complied.

91)   Ultimately, Brandt was entering after being advised by an Officer of the Court (his Attorney, Mark Burton), that a Judicial Officer (Judge Jackson) had ordered him back.

92)   Garegnani was aware Bandt had been ordered by the Judge to appear before his Bench.

93)   Garegnani testified he was aware failing to appear before a Judge can result in an Arrest Warrant.

94)   Garegnani had no authority to advocate a Judges directives.

95)   No reasonable Officer confronted by this knowledge could objectively believe Plaintiffs "knew" they were not permitted to re-enter the Courthouse at a later time.

96)   No reasonable Officer confronted with the circumstances confronting Garegnani and Lukajic could objectively believe Brandt or Sodaro had committed a violation of 38-115 D.R.M.C.

97)   Defendants' enforcement of 38-115 D.R.M.C. was objectively unreasonable given the circumstances confronting them.

98)   Defendants knew, or should have known, that Plaintiffs had not violated 38-115 D.R.M.C.

99)   Defendants sought to enforce 38-115 D.R.M.C.  As a result of and in retaliation for Plaintiffs' First Amendment-protected speech prior to this 2019 December 11, on 2019 December 11 inside the Courthouse and outside the Courthouse, and for their perceived association with so called "Occupy Denver."

100)   The regulations at tissue here are  to restrict pure speech. The core of Defendants' restrictions on Plaintiffs' speech speaks from 18-9-111 (1)(b) C.R.S.-Harassment by obscene

gesture.

101)     Defendants seek to invoke 18-9-111 (1)(b) by erroneously asserting the singular hand

gesture of a raised middle finger constitutes "obscene gesture".

102)     Garegnani repeatedly enforced 18-9-111 (1)(b) against others in the previous weeks for

using the exact same gesture (Janet Matzen and Alan Moody), and for showing him a cartoon

image depicting the same gesture on a smartphone screen (Plaintiff Irizarry).

103)     Garegnani repeatedly told Plaintiffs "that's an obscene gesture".

104)     Garegnani took the time to show Plaintiffs the ostensible authority he was enforcing

against them.  The Statute he presented to them was specifically 18-9-111(1)(b).

105)     Garegnani explained in no uncertain terms that Plaintiffs must either halt their use of just

that one hand signed communication exclusively.

106)     Garegani verbally reported to fellow Sheriff's Deputies and responding Denver Police

Officers that Plaintiffs were expelled from the Courthouse because they used the middle finger

gesture.

107)     Both Garegnani and Lukajic filed written reports wherein they state that Plaintiffs used

obscene gestures in violation of 18-9-111(1)(b) 1.

108)     Other Officers on scene shared the same mistaken belief that "Section B" constituted a

criminal prohibition against the middle finger gesture.

109)     Garegnani wrote in his statement several hours after Brandt advised him to read section

1.5 that "this gesture in my experience commonly be interpreted as sexually suggestive".

110)     Plaintiffs frankly find this assertion to be absurd.  Plaintiffs have presented this

statement to literally hundreds of individuals since he wrote it.  Not one single person so tested,

responded with a single iota of belief.  The vast overwhelming response instead has ranged

from chortles, to giggles, and up to outright laughter.

111)     Garegnani's assertion that the middle finger can commonly be interpreted as sexually

suggestive is a laughable attempt to salvage his unlawful conduct after being informed to keep reading the Statute.

112)     When Brandt asked Garegnani if the first time he asserted the gesture was obscene if he genuinely believed the gesture constituted an invitation to engage in sexual relations. Garegnani sharply reiterated "uh--pause--no."-utterly betraying his bogus assertion later.

113)     18-9-111(1.5) Expressly limits "obscene" as "a patently offensive graphical description of an ultimate sexual act."

114)     Despite Defendant's actual basis for their enforcement at the time of the incident, and in their reports, Garegnani later disavowed himself at Motions Hearing more than a year later on 2021 March 24, where on cross examination he was asked if he based his decision to remove Plaintiffs on the harassment Statute by claiming that if the code applied, that would have resulted in another criminal charge.  (Abandoning, ex post facto, the indisputable realities of the actual incident, and instead shifted his theory of probable  cause to the false narrative)- debunked by recordings-that Plaintiffs were yelling and screaming; yet another in a series of attempts to salvage his legally infirmed "obscenity" assertion.

115)     That the middle-finger gesture is  "obscene" has been clearly well established since at least 1996, where the Courts then made it clear that the robust body of Law at that time was not even then of recent vintage. It has been equally well established for a generation or more that "flipping off" the Police is protected speech.

116)     18-9-111(1)(b) does not proscribe hand gestures-it exclusively proscribes "obscene" gestures.

117)     The middle-finger gesture conveys a universally accepted message-it conveys a message of disagreement or disapproval.

118)     "The finger", has become so ubiquitous, and declined so profoundly from incendiary value that it can be seen routinely employed on t-shirts, bumper stickers, political signs, social

media posts and main-stream movies and television programs.  There is even a whole television series premised on ancient gesture titled "Kevin Can F**k Himself".

119)     Plaintiffs' speech showing disapproval of Law Enforcement in general, and Deputy Garegnani specifically, are matters of public concern.

120)     18-9-111(1)(b) provides that this section is not intended to infringe on the Rights of Persons to express political or philosophical viewpoints.

121)     Plaintiffs' message was clearly understood by persons viewing it: Defendants knew-Garegnani wrote that the gesture can commonly be interpreted as "Fuck You"; a bystander approached Brandt to shake his hand and thank him "for standing up to Police".

122)     As such, the gesture constituted expressive activity intended to communicate a message which in context would be reasonably understood by the viewer as such.

123)     Defendants' misapply 18-9-111(1)(b), harassment by obscene gesture, to punish Plaintiffs for speech both past and instant, and they found objectionable through the sinister mistaken belief they had 'discovered' a legal "loophole" in the "obscenity" Law.

124)     Garegnani and Lukajic did not seek to apply 18-9-111(1)(b) out of any legitimate desire to bring to justice a person they reasonably believed to have committed said crime, but rather a mere guise to punish their speech which defended them.

125)     Even if a reasonable person were to interpret the gesture as "sexually suggestive", as Garegnani hysterically proposes, the threshold is "pattently offensive" "graphical description" of an ultimate sexual act"-not merely "suggestive"

126)     No reasonable Officer in Defendants' positions could reasonably believe the middle-finger gesture would give rise to believe probable cause existed that Plaintiffs had violated 18-9-111(1)(b).

127)     Defendants' enforcement of 18-9-111(1)(b) was objectively unreasonable given the circumstances confronting them at the time.

128)     Defendants knew, or should have known, that the middle-finger gesture did not constitute a violation of 18-9-111(1)(b).

### JOINT JUDICIAL ORDER #19-1 CANNOT BE CONSTITUTIONALLY APPLIED

129)     Garegnani and Lukajic, through their verbal and written statements, and Garegnani through his testimony, seek to involve Joint Judicial Order JO #19-1.

130)     JO #19-1 frankly does not restrict the speech in question.

131)     JO #19-1 does not proscribe speech generally, nor hand gestures, nor silent symbolic speech.

132)     For at least four years, Plaintiff Brandt regularly wore t-shirts emblazoned with the words "Fuck Cops".  Once, in 2015, Denver Sheriff's Deputies in conjunction with HSS Security, refused Brandt access to the Court facilities because of his odious shirt.  Brandt went directly to his Attorney's office (David Lane) who made a single phone call before instructing him to return.  The same individuals were waiting to welcome him back in.  Since that event, Brandt has never been removed for these "Fuck Cops" shirts by any deputy-including Garegnani or Lukajic.

133)     Since that time, many others have also worn such shirts, including Kyle Shockley and Abade Irizarry without issue.

134)     JO #19-1 does not proscribe clothing with potentially offensive messages.

135)     Nor does JO #19-1 prohibit other potentially offensive speech.

136)     JO #19-1 does not proscribe speech directed at strangers.

137)     JO #19-1 does not proscribe speech directed at Officers.

138)     JO #19-1 does not proscribe speech which is critical of Officers or Staff.

139)     JO #19-1 is intended to, according to its delineated purpose, to proscribe certain enumerated "conduct" which "unreasonably interferes with Judicial Operations", "Regardless

of the content or viewpoints expressed".

140)     JO #19-1 Expressly prohibits the following conduct without regard to content on

viewpoints expressed: Displaying signs or other materials; distributing literature or other

materials obstructing the passage of any other person interrupting judicial proceedings; yelling

or making other audible outbursts; using sound amplification; harassing, intimidating, or

threatening Court personnel or others; or engaging similar conduct that interferes with the

ability of employees to carry out the business of the Courts or the ability of other person to

effectively access the Courts.

141)     The recorded evidence obviates the fact that none of the enumerated proscribed conduct

above could have formed the legitimate basis for Garegnani's decision to force them to leave.

142)     At the time Garegnani decided to expel Brandt and Irizarry, and that he initiated physical

dominion over them with the intent to remove them, none of the listed prohibited conduct was

alleged to have occurred with the sole exception of "harassing".

143)     As debunked elsewhere, the enforcement of 18-9-111(1)(b) lacked probable cause as a

matter of Law.

144)     Defendants again seek to invoke what they believed to be a legal loophole to enforce 18-

9-111(1)(b) vicariously through JO #19-1.

145)     Again, and for the same reasons, this assertion cannot be constitutionally applied.

146)     No persons were obstructed from access to any Court services.

147)     Plaintiffs stood underneath the stairs out of the way of people's passage.

148)     Plaintiffs' silent display of hand gesture language did not interfere with the ability of any

employees to carry out the business of the Courts.

149)     Plaintiffs conduct did not disrupt any Court proceedings.

150)     No person complained that they were offended or disturbed.

151)     Plaintiffs had not been yelling or making outbursts.

152)     It is apparent from a plain reading of the regulations, announced purpose that the measure is whether Courthouse operations has been, or is eminently about to be disrupted.

153)     The recorded objective evidence shows that no such disruption occurred as a result of Plaintiff's conduct (to give) rise to Defendants' enforcement of JO #19-1.

154)     JO #19-1 is ostensibly content and viewpoint neutral restriction on conduct and not speech, per se.

155)     Defendants enforcement of JO #19-1, however, constituted a content and/or viewpoint restriction.

156)     Plaintiffs conduct of directing hand gestures with commonly understood meanings which connotes support of Garegnani (thumbs-up) or otherwise non-negative connotations (pinky-up, index-up, pointer-at) was explicitly permissible.

157)     Sodaro and Solis were told they could insult Garegnani verbally so long as they did not yell-and they did so without consequence.

158)     Sodaro's and Solis's vociferous scoldings were plainly audible to anyone in the vicinity and clearly captured on the audio recordings.

159)     By contrast, Garegnani's interactions with Brandt and Irizarry are best characterized as a calm and mature discussion, and is largely difficult to discern without significant amplification of the same recordings.

160)     Garegnani himself wrote in his official report. "Since at this time Mr. Brandt was talking to me in a calm manner, I took the time to show him the CRS Code  18-9-111(1)(b)(sic) harassment.

161)     Garegnani testified consistently with that statement in his 2021 March 24 testimony under oath characterizing Brandt's "tone of voice" as "conversational".

162)     Garegnani further described under oath, Brandt's conduct immediately preceding his approach of Brandt to enforce JO #19-1 as "non-verbal", "standing underneath the [docket]

monitors'" (which are mounted to the passageway side of the stairs), "Flipping [us] off", and "not saying anything".

163)     Even with the side range of conduct subsumed under JO #19-1, Brandt or Irizarry's silent production of a middle finger gesture from about 29 feet away from Officers, underneath a staircase could not create a reasonable suspicion, much less a probable cause to believe a violation of JO #19-1 had occurred.

164)     Garegnani knew Brandt's and Irizarry's conduct issuing middle-finger gestures did not constitute interference with Judicial operations.

165)     Sodaro repeatedly interrogated Garegnani.

166)     At one point, when Garegnani is being interrogated, he states, "I'm trying to have a conversation with [Brandt]".

167)     These interruptions clearly interfered, at least to some mild degree, directly with the operation at hand-namely Garegnani's attempt to explain the obscenity laws to Brandt.

168)     Sodaro, Solis and later Moody were very vocal; Moody was very loud.

169)     However, Garegnani wrote in his statement that he "was not planning on removing Caryn Sodaro or any other Occupy members {Solis, Moody] because they had not violated the Joint Orders at this time".

170)     Thus, it is clear, Garegnani was cognizant at the time that the true measure of JO #19-1 was whether there exists some meaningful disruption to Courthouse operations.

171)     It is clear, Plaintiff's conduct did not meet the threshold for enforcement.

172)     Defendants misapply JO #19-1-prohibited conduct in Court facilities-to punish Plaintiffs for their speech, both post and instant, which they found objectionable through the sinister mistaken belief they had "discovered a legal "loophole" in the vicarious equally misguided 18-9-111(1)(b) harassment statute.

173)     Garegnani and Lukajic did not seek to apply JO #19-1 out of any legitimate desire to

bring to justice a person they reasonably believed to have caused a Courthouse disruption, but rather a mere guise to punish the Plaintiffs speech, which they found offensive to them personally.

174)     Defendants enforcement of JO #19-1 was objectively unreasonable given the circumstances confronting them at the time.

## INITIAL ENCOUNTER

175)     On 2019 December 11, at about 0850 Hrs., Plaintiff Brandt was leaving the Lindsey-Flanigan Courthouse located at 520 West Colfax Avenue in Denver, Colorado, when he noticed Defendant, Denver Sheriff's Deputy Bret Garegnani, sitting at the Information Desk. Brandt, having knowledge of Garegnani's recent escalating conduct to force trespass, under threat of arrest, of law abiding citizens, in response to displays of middle-finger gestures directed at him. Brandt knew Garegnani removed Janet Matzen on multiple occasions, Alan Moody on one occasion-each for flipping him off. Brandt was also aware that Plaintiff, Abade Irizarry, was removed for displaying a cartoon image of a middle finger at him on a smartphone device. Brandt knew Garegnani's misconduct could not be adequately confronted without Witnesses and objective evidence.  Brandt asked Sodaro to remain with him as a Witness.

176)     Brandt asked Mr. Shockley to go outside and initiate a recording through the windows. Once Shockley indicated he was ready, Brandt took up a position near the windows but not blocking anyone's access or passage underneath the stairs.

177)     Brandt silently produced a middle-finger gesture directly at Garegnani.  Garegnani approached Brandt and told him to "Put that away".  Brandt ignored him and continued silently directing the middle-finger gesture at him.  Garegnani moved to block Brandt's line of sight to Shockley's camera.  Brandt re-positioned to be directly in Mr. Shockley's view.

178)     As this was happening, Garegnani told Brandt he could not display an obscene gesture in the Courthouse.  Brandt was very familiar with the Law regarding "obscene gesture" and knew the middle-finger was not obscene as a matter of Law.   C.R.S. 18-9-111 (1.5) expressly defines "obscene" as "a patently offensive graphical description of an ultimate sexual act". Brandt asked Garegnani if he "genuinely believed this gesture in any way implied a desire to engage in sexual relations"?

179)     Garegnani replied "uh,-pause-no." Brandt produced a "thumbs-up gesture and asked if this gesture was permissible.

180)     Garegnani told Brandt it was.  Brandt repeated the inquiry for each gesture of ["pinky finger-up", "index finger-up", "pointer finger-at"] in succession.  Garegnani affirmatively responded to each that each was also permissible.

181)     Brandt re-issued the middle-finger gesture and asked "But not this".  Garegnani re-confirmed that the middle-finger gesture was not allowed.


182)     Brandt knew this could not be true, so he produced two middle fingers in response. Garegnani told Brandt he had a Judge's Order.  Brandt told Garegnani "I'm going to have to see that Order".  Garegnani said "ok". and walked over to the desk.

183)     Despite being certain there could not possibly be any Order prohibiting a silent display of the timeless symbolic gesture of disapproval directed at a Government Official, Brandt none-the-less gave Garegnani benefit of the doubt and suspended his gesture pending Garegnani's display of such Order.  Garegnani never produced such an Order.  Instead, he grabbed a book Brandt recognized as a Colorado Revised Statute Book.

184)     Brandt approached the desk and said "Oh, you're going to show me Eighteen dash Nine dash One-eleven"! The Canine Handler, who was behind the desk, gleefully exclaimed "Yeah!

Section B"!

185)      Indeed, Garegnani directed Brandt to 18-9-111 (1)(b) which prohibits a person from, with intent to annoy, alarm or harass, he or she, in a public place, directs obscene language or obscene gestures at another person.

186)      Brandt also read Section 1.5 defining obscenity to refresh his memory.

187)      Also to refresh his memory, Brandt also read Section 8 which provides that this Statute is not intended to infringe on the Rights of the People to express religious, political, or philosophical viewpoints.

188)      Garegnani produced no authority whatsoever to restrict the middle-finger gesture.

189)      Brandt was aware that the right to display a middle finger toward Law Enforcement was clearly well established, supported by a very robust body of case law by at least 1996 (see Nichols v. Chacon 110 F. Supp. 2d 1099).

190)      Brandt was also aware that the middle-finger gesture is not, and has not for many decades, considered to be obscene. (also well described in Nichols, 1.0)

191)      Brandt was also aware that silent symbolic speech in a Courthouse corridor has been protected speech since 1971. (see Cohen v. California 403 U.S.15).

192)      For these reasons, Brandt returned to his previous location under the stairs, and in the direct view of Shockley's camera, and resumed directing a middle-finger gesture at Garegnani.

193)      At this time, Irizarry, who also read the Statute with Brandt, also stood under the stairs and directed his own middle-finger in Garegnani's direction.

194)      Garegnani approached Brandt and asked "do you disagree with that, Eric? Or what?"

195)      Brandt replied "a hundred percent."

196)      Garegnani asked "Why's that?  It's in the C.R.S. right there.  You just read it."

197)      Brandt correctly retorted "no. it's not."

198)      Garegnani asked "what is it you disagree with in the C.R.S. Code?; I'm asking you why

you think that is."

199)      Brandt explained "I'm warning you that this is very well established that this is not an

obscene gesture."

200)      Irizarry and Brandt asked if anyone present was offended by the gesture.

201)      No one present indicated any offense.

202)      Infact, the only responses were smiles, a chuckle and one "I'm not offended."

203)      Garegnani re-asserted "that's an obscene gesture, right?"

204)      Both Brandt and Irizarry sustained directing their middle finger in Garegnani's direction.

205)      Garegnani said "I"m gonna have to ask you to leave."

206)      Brandt asked, "I need to understand what the consequences will be if I elect not to

leave."

207)      Garegnani replied "If you don't leave now I'm going to escort you out."

208)      Brandt what "Escort" means.

209)      Garegnani explained "I will put my hand on you and guide you out."

210)      Brandt asked, "Will I be under [Custodial] arrest?'Garegnani said "If you resist me."


**CONTEMPORANEOUSLY**


211)      Contemporaneously, Sodaro asked Garegnani "What about speech? Free Speech?"

212)      Garegnani replied "Speech is definitely allowed."

213)      Sodaro asked "So, freedom of speech like you're a fat murdering pig that got away with

murder.-That's freedom of speech, right? And I can say that all I like?"

214)      Garegnani confirmed "Yes, Ma'am, you can."

215)      Sodaro said "So, you're a fat, disgusting, murdering pig and that's freedom of speech?

Really?"

216)     Garegnani warned her, however, "now I will let you know...I will let you know this...if you start yelling…"

217)     Sodaro interupted, "But I'm not yelling; I'm saying you're a fat murdering pig."

218)     While Garegnani was showing Brandt the obscene gesture statute, Johna Solis teased him, "Ooh! He knows how to look something up!" and Sodaro said, "He's being a big baby."

219)     Then Solis and Sodaro teased Garegnani, A former linebacker, about his football career with Solis exclaiming "He was the whole front line!" And Sodaro, in direct reference to Garegnani's involvement in the Michael Marshal death, said, "So you just sat on them and crushed them and murdered them?"

220)     At one point, Sodaro told Garegnani "You need to grow up. Quit being a pussy about people flipping you off, you little pussy."

221)     In 2021 October, Garegnani was finally terminated from the Denver Sheriff's Department for a similar attack in 2021 March on a handcuffed man at the Courthouse wherein he slammed the man face down into the ground and applied his 350 lb. weight to the man's back for several minutes.  This man, unlike Marshall, survived,  miraculously.

## REMOVAL AND EXIT

222)     Brandt told Garegnani he would not resist him, but would leave under escort.

223)     Garegnani said "Ok, then I'm gonna escort you out."

224)     Irizarry said "I need one too."

225)     Garegnani said "Ok."

226)     Sodaro said "I need one too."

227)     Garegnani laughed at Sodaro and said "You don't need one. Why do you need one?"

228)     Brandt said "I need to get my bag."

229)     Garegnani said "Ok."

230)     While Brandt was retrieving his bag, a passerby who had been watching in the background, approached Brandt, shook his hand, and thanked him for standing up to the Police.

231)     When Brandt was ready, he advised Garegnani "I'm prepared to be escorted out of the building."

232)     Garegnani said "Let's go."

233)     Brandt reminded Garegnani "You said you were gonna put hands on me and escort me out."

234)     Garegnani applied force to Brandt's back and guided Brandt to the Elati Street exit doors (Main entrance).

235)     While walking toward the doors, Garegnani asked Brandt, since he took the time to show Brandt the Statute he was applying, if Brandt was willing to explain why he felt the [Harassment by Obscene Gesture] Statute did not apply.

236)     Brandt said "Yeah, you need to read Section One Point Five."

237)     As Brandt and Garegnani stepped outside, Brandt told Shockley, "I have been--uh--escorted out of the building--because apparently this gesture [middle finger] is impermissible. Uh--we can call him a fat murdering pig, That's ok.  But we cannot silently present a silent gesture of disapproval."

238)     Garegnani replied "Alright. You have a good day Eric," and went back inside.

239)     Throughout this entire encounter, Brandt was calm, and conversed with Garegnani in a normal tone of voice.  Brandt's volume was so low that it was difficult to hear most of the exchange despite recording devices only a few feet away.  Brandt created no disruption to anyone which could warrant removal.

240)     No person was blocked or impeded.

241)     No person complained.

242)     No person present or likely to be present had any reasonable likelihood of responding in

a disorderly manner.

243)     When Garegnani returned inside, he approached Irizarry and confirmed that because of

his middle finger gesture, he too needed to leave.

244)     Garegnani applied force to Irizarry's back and guided him toward the doors.

245)     Irizarry said "Why am I leaving? Because of this gesture? I wanted to let you know that

you are violating my Civil Rights.  I'm putting you on notice.  I'm trying to throw you a bone."

246)     Despite the fact that, like Brandt, Irizarry had engaged Garegnani in a normal voice, and

was not yelling.  Garegnani told Irizarry "I'm going to need you to stop yelling."

247)     As Irizarry and Garegnani excited the building, Garegnani told Irizarry, "You have a

good day, Sir."

248)     Brandt replied, "I'm gonna have a great day! Check-mate motherfucker!! Check-mate!"

249)     Irizarry said, "I'm gonna have a great day! I'm gonna order you into Federal Court.

'You're gonna be called "Defendant!"

250)     Garegnani replied, "Sounds good."

251)     Brandt admonished him, "You can't say I didn't give you plenty of opportunity.  I

warned ya.  Should have stayed with football there buddy."

252)     Garegnani returned inside where he noticed Sodaro holding up her phone.

253)     Garegnani asked her, "Are you recording? You can't record in the Courthouse, Ma'am."

254)     Sodaro said, "I'm holding my phone.", to which he said, "ok."

255)     At this time, Garegnani, thinking Alan Moody was trying to ask him a question, asked

him "What's that?"

256)     Moody became instantly infuriated at Garegnani and began screaming at him." I'm not

talking to you!  You need to write it down!  You wanna play this fucking game today?!"

257)     Garegnani said, "Not really."

258)     Allen Moody continued to scream at Garegnani very belligerently, loudly and disruptively creating an obvious disturbance.

259)     Garegnani did not confront him, nor admonish him, nor warn him to quiet down, nor order his removal.  Instead, he just turned around and walked away from him.

260)     Garegnani returned to Sodaro.  He told her, "You can't record in the Courthouse, Caryn, you know that."

261)     Sodaro turned away from him and walked out the doors to rejoin Brandt.


262)     This concludes the first encounter.


## THE SECOND ENCOUNTER

263)      After a brief protest in front of the Courthouse, the group split.  Shockley, Irizarry and Solis left company and Brandt, Sodaro and Moody went East on Colfax Ave. to conduct other errands.

264)     About half hour later, Brandt's Attorney called him to advise him Judge Jackson was ordering him to report immediately to Courtroom 3F where Jackson decided to hear Brandt's request to travel to Montana to visit his Mother, who was gravely ill and on a ventilator.  Brandt and Sodaro dispatched at once back to the Courthouse.

265)     As Brandt and Sodaro were screening through Security, Garegnani approached them and told them that because they had been removed earlier in the day, that they could not come back in.

266)     Brandt informed Garegnani that Judge Jackson had just ordered him to return.  Sodaro pointed out that she had never even been told she had to leave.

267)     Garegnani told Brandt that if he did not leave, he would be arrested for Trespassing.

268)     Brandt gathered his belongings and left the building under protest.

269)     Brandt called his Lawyer who also came downstairs.

270)     Garegnani followed Brandt outside.

271)     By this time Moody arrived.

272)     Brandt and Moody boisterously protested Garegnani and other Deputies who began coming out.

273)     Deputies inside the building contacted Garegnani to inquire about Sodaro, who was still inside, as to whether she had been kicked out already that day.

274)     Garegnani informed them that she had been, and that if she did not leave, to take her into custody for Trespass.

275)     Sodaro left upon this report.

276)     Garegnani and Lukajic, both of whom were present participants during the first encounter, made verbal reports to fellow Officers about Brandt's, Irizarry's and Sodaro's earlier interactions with them.

277)     They also both reported that they had together escorted Brandt and Irizarry out of the building for showing their middle fingers, in violation of JO #19-1.

278)     They also both falsely reported that they had removed Caryn Sodaro for recording in violation of JO #19-2.

279)     Deputy Thomas and Deputy Sergeant Valenzuela went to Courtroom 3H to speak with Judge Jackson to forward Garegnani and Lukajic's story to the Judge.

280)     Based on this report, Judge Jackson vacated Brandt's Hearing on Emergency family travel, which caused Brandt to be delayed another day from visiting his Mother.

281)     When Brandt, who was demonstrating outside, was given the news, he became extremely angry and rachetted up his protests and his assertions that he was going to sue Garegnani.

282)     Denver Police Sergeant, Jaime Lucero arrived during this protest and went inside.

283)      The Denver Sheriff's Deputies, including Garegnani and Lukajic also went inside.

284)      Brandt, Sodaro and Moody ended their demonstration after all the Officers had gone

inside and they left the area.


**AFTERMATH OF EVENTS**

285)      The aftermath of these incidents is found in the verbal and written reports made to Law

Enforcement by Defendants Garegnani and Lukajic.

286)      The Denver Police, The Prosecution Teams, and the Municipal Judges, each took their

actions as the logical natural consequences of Garegnani's and Lukajic's verbal and written

reports.

287)      Unfortunately, these reports were knowingly and materially false and misleading.

288)      Thanks to the available recordings, there is objective evidence which proves Defendants

fabricated the bulwark of their story.

289)      The literally dozens of false statements formed the basis for the arrests and prosecutions

of Brandt and Sodaro for alleged violations of 38-115 Denver revised Municipal Code-

Trespass; and also resulted in the defamations of Brandt, Sodaro, and Irizarry.

290)      The statements of Garegnani and Lukajic are provided below, not being accepted as true

by Plaintiffs and Plaintiffs do not acquiesce to their veracity; quite to the contrary, Plaintiffs

expressly allege them to be untrue.  While the statements themselves are fraudulent, what is true

is that they were made by the Defendants.

291)      The listed Statements are not exhaustive of those made.

292)      As to Lukajic: -(Re: First Encounter)

293)      Lukajic wrote "At one point, when they started yelling, Deputy Garegnani ordered Eric

Brandt several times to leave the building advising him of JO #19-1."-Not true.

294)      Lukajic wrote that the group was "yelling obscenities in general."-not true.

295) Lukajic wrote, "while they were escorted outside the building, Deputy Garegnani told them that they are done for today in the Courthouse because of their behavior and interference with Judicial Orders and disrupting the orderly use of Court facilities."-not true.

296) Lukajic was an eye-and ear-witness to the entire first incident and actively participated in the escorts of Brandt and Irizarry, and was standing next to Garegnani when he discussed recording with Sodaro.

297) Lukajic knew these statements were false.

298) Lukajic deliberately and wantonly and in reckless disregard of the truth with the intention of mischaracterizing Plaintiff's behavior as disruptive, loud, and vile.

299) Lukajic's fraudulent statements were part of a scheme to portray Plaintiffs as disorderly to justify their removals from the Courthouse.

300) Jukajic lied about Plaintiffs being advised they could not come back that day in order to conjure up probable cause to justify criminal prosecutions against Brandt and Sodaro for trespassing.

301) As to Garegnani-(Re: First Incident).

302) Garegani's falsehoods are too numerous to enumerate below, so only a sample is shown.

303) Garegnani repeatedly suggests Plaintiffs were flipping off/making obscene gestures at members of the public and causing a disturbance-not true.

304) Garegnani wrote, "This gesture from my experience commonly can be interpreted as sexually suggestive."-Laughably untrue.

305) Garegnani wrote, "[Sodaro] started making statements such as …'you are a fat fucking murderer who should blow his own brains out and die.'"- outrageously and violently false.

306) Garegnani wrote, "Mr. Brandt turned toward members of the public… flipping them off with a middle finger and yelled at them."-never happened.

307) Garegnani wrote, "Irizarry then started to join in with Sodaro with making statements

'you are a fat murderer you fat fuck.'"-No he did not.

308)    Garegnani wrote, "As I approached the front entrance of the Courthouse, I told Mr.

Brandt, " you have been kicked out and are done for the day."- No he did not.

309)    Garegnani wrote, "During the escort out, Mr. Brandt started to scream so loudly "No

Justice No Peace" causing even more of a disturbance.  This caught the attention of most

individuals in the area."-This is an outrageous lie,

310)    Garegnani wrote, "Mr. Irizarry again said 'you're going to have to escort me out fat

boy,'"- Again? He never once called him a "Fat Boy".

311)    Garegnani wrote, "I told Mr. Irizarry, you have been kicked out and are done for the

day." Not true.

312)    Garegnani wrote, "During the escort out, Mr. Irizarry started to scream very loudly 'fuck

you, you fat fucking pig, you wonder why Cops are being killed all over the Country'".-

Monstrously untrue.

313)    Garegnani wrote, "I then told [Sodaro] again to stop recording or she would be ordered

to leave the building as well."- Actually he never told her to stop recording, and never

threatened to remove her.

314)    Garegnani again wrote, "I then again ordered her to stop recording."-Equally untrue.

315)    Garegnani wrote, "Sodaro refused both."-Not true.

316)    Garegnani wrote, "I then gave [Sodaro] a direct order to leave the Courthouse…"- He

certainly did not.

317)    He continues with, "... and [I told her] that she was also being kicked out for not

abiding by the Joint Orders signed by the Judges."-Complete lie.

318)    Garegnani wrote, "While Mrs. Sodaro was walking out and I also stated, "You are

done for the day."-This is the third time Garegnani professes to make this statement, yet he

never even said it once.

319)        Garegnani knew the effect of attributing outrageous statements such as "Blowing his

brains out and die" and "You wonder why Cops are being killed all over the Country."  And the

other insidious comments to Plaintiffs would have the natural effect on any person reading his

report of causing them to see Plaintiffs in a villainous light and think less of their character.

320)        The same goes for Lukajic's allegation that Sodaro screamed "Fuck you" at them.

321)        Theses alleged comments, coupled with allegations that Plaintiffs were yelling and

screaming and causing a disturbance, Defendants knew, would lend credence to their claims

that there existed justification to enforce JO #19-1.

322)        Defendants knew their allegations were not true when they uttered them to fellow

Officers, Denver Police, and in their official reports.

323)        By the time Defendants made these false utterances portraying Plaintiffs as boisterous,

unruly and nasty, they had become aware that their obscene gesture claim pursuant to 19-9-111

legally infirm, and they knew that without alleging an actual disturbance they could not invoke

the enforcement of JO #19-1, and that without some legal justification, halting Brandt's and

Irizarry's silent speech and removing them from the building, exposed them to liability such as

the litigation here.

324)        Defendants also knew that they had not ordered Caryn Sodaro to leave the property at

all.

325)        And they also knew they did not admonish any of the Plaintiffs that they could not

return later in the day.

326)        Defendants knew that without a clear instruction to that effect, they could not show the

essential Mens Rea for the crime of trespass, which is "knowing" that they could not return.

327)        The importance of this critical element was known to Defendants when they fabricated

this claim as evidence.  By Garegnani's followup statement where he wrote: "I stated you are

done for the day" this is a statement that is a common practice for me when I am forced to

remove people from the Courthouse that way they understand the expectations of the Courts and Deputy to not return to the Courthouse the same day that they have been removed."

328)     That statement was also a lie as evidenced by (1) the recordings prove he never said it to any of Plaintiffs that day; (2) He had not said so to either Moody, nor Matzen, nor Irizarry in the previous instances; and (3) During his testimony 2021 March 24, he could not remember what he had said and had to refer to his statement to remember what his so-called "common proactive" was.

329)     Garegnani testified at Motions Hearing 2021 March 24.

330)     Among the questions at issue that day included whether Defendants had authority to expel Brandt (or Irizarry) in the first place.

331)     Garegnani abandoned his contention that the middle finger gesture constitutes harassment by stating that if the CRS applied then it would have been another charge.

332)     Garegnani instead focussed his testimony on the contrived notion that Brandt was loud and disruptive.

333)     Garegani more than doubled down on his fractious yarn.

334)     Plaintiffs have identified some false statements by Garegnani under oath.

335)     Of particular relevance were about 40 allegations that Brandt was getting more and more frustrated, confrontational and agitated, getting louder and louder all the time, yelling and screaming, yelling at passerbys, and drawing the attention of countless disturbed persons all the way down the corridors. -All perjury.

336)     Garegnani repeatedly asserted that his decision to remove Brandt was based on Brandts yelling, specifically, he testified that he did not remove Brandt until the point Brandt began yelling and making outbursts--None of such conduct ever occurred as proven by the recordings.

337)     Garegnani was given full opportunity on cross examination to recant his false testimony and he chose not to.

338)     Instead, he repeated the same bogus narrative, even amplifying it with further embellishments.

339)     Garegnani testified repeatedly that when he escorted Brandt out, he told Brandt he was "Done for the day."

340)     On cross examination, he was asked to describe exactly when and where he delivered this admonishment.  He expressly described that he said it before Brandt reached the inner lobby doors, and that he said it loud enough for anyone nearby to have heard it.

341)     When Garegnani asked if he had any indication that Brandt might not have heard him tell Brandt he could not come back that day, he replied, " I don't know if he heard it or not whether he heard it or not.  At the time he was also yelling and screaming as I was escorting him out and that he was not to come--that he was kicked out for the day"

342)     That Garegnani and Lukajic knew that without the false narrative of yelling and screaming was essential to their feigned authority to remove Brandt and Irizarry in the first place is evident from three pieces of evidence in particular: (1). The recordings capture Garegnani advising Sodaro that she "Definitely" had freedom of speech.  Provided she did not yell; (2). He memorialized that exchange in his written statement, adding that her freedom of speech was "Unfortunate"; and critical (3) He testified that "obviously when he's talking in a normal voice he can for the most part say whatever he wants.  It's protected under freedom of speech.  Then there would be other times when he would say things louder, which would be when he was getting into the yelling and making outbursts, which is why he was removed."

343)     Garegnani and Lukajic were apparently blase (blase) to their own belief that there existed at least one recording since they falsely alleged they had removed Sodaro for the very recording which proves they did not!

344)     Unfortunately for everyone involved, Defendants intentional, malicious, wanton, knowing, negligent and reckless disregard for the truth resulted in numerous injuries to all

Plaintiffs, at great expense to the tax paying Public.

345)    Because of Defendants fraudulent allegations, Denvver Police Officers Lt. Kenneth Chavez, Sgt. Jaime Lucero, CPL.Lisa Aitken-Nelson, Officer Evan Morton and others made a determination that there existed probable cause to arrest Brandt and Sodaro because "They re-entered the Courthouse after being told to leave, thereby committing the crime of trespass."

346)    The following morning, 2019 December 12, Brandt appeared before Judge Jackson whereupon he was granted permission to travel to Montana on his Family emergency.

347)    As Brandt was leaving the Courthouse, Lt. Chavez and more than half-dozen Denver Police Officers who had been laid in wait for Brandt to exit, whereupon they ambushed him and took him into custody charging him with 38-115D.R.M.C.-Trespass.

348)    Upon learning that Garegnani had caused him to be arrested on a bogus charge, thus preventing him from traveling to see his dying Mother, Brandt suffered extreme emotional distress and cost all rational emotional control.

349)    On 2019 December 13 Brandt was released from custody after posting a monetary bond. Brandt spent two days in custody.

350)    Both Brandt and Sodaro were prosecuted under these false premises for nearly a year and a half.

351)    Following Garegnani's testimony from 2021 March 24, the Prosecution was made aware of the recordings captured by Irizarry and Sodaro.

352)    After the revelations that their prosecutions against Brandt and Sodaro were founded upon fabricated evidence, both Brandt's and Sodaro's cases were dismissed and terminated in their favor.

## FIRST CLAIM FOR RELIEF

## 42 U.S.C. §1983-FIRST AMENDMENT FREE SPEECH VIOLATIONS

## PLAINTIFFS IRIZARRY AND BRANDT AGAINST DEFENDANTS GAREGNANI

**AND LUKAJIC**

353)     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if full set forth

herein.

354)     At all times relevant to this Complaint, Defendant Garegnani was acting under the full

color of State Law.

355)     Plaintiffs Brandt and Irizarry each engaged in First Amendment -protected speech in

showing middle-finger gestures silently in Garegnani's direction.

356)     Plaintiffs' speech criticizing Garegnani was on a matter of public concern, and did not

violate any Law or Regulation.

357)     Plaintiffs speech occurred in a limited public forum which was open at the time and

place in which the speech occurred to the manner and subject matter at issue and to the speakers

present at the time to include Plaintiffs.

358)     Defendant Garegnani affirmatively confirmed Plaintiffs were entitled to free speech on

this otherwise permissible subject matter, and otherwise permissible form of speech at this time

and place.

359)     Defendant Garegnani took issue solely with the middle-finger gesture, and no others,

based on his misplaced belief the gesture violated the State's Obscene Gesture Law.

360)     Defendants desired to leverage what they wrongfully believed to be a legal loophole to

retaliate against those who had long been harsh critics of their performance as Law

Enforcement Officers.

361)     Garegnani's stopping Plaintiffs' speech and forcing them to leave the building under

threat of arrest was a consent and/or viewpoint restriction on Plaintiffs' speech.

362)     That the display of the middle finger is

363)      an "obscene" gesture has been clearly well established in State and Federal Law for

decades.

364)     That flipping off Law Enforcement has been protected 1st Amendment speech has been

clearly well established for decades.

365)     The freedom of individuals to oppose or challenge Police action, and to criticize Public

Officials has been clearly well established for over Thirty years.

366)     Viewpoint-based restrictions have been widely known to be unconstitutional for more

than Eight decades.

367)     Defendant Darko Lukajic did nothing to stop Garegnani from halting Plaintiffs' speech

or removing them from the building, and by accompanying Garegnani with his escorts of

Plaintiffs actively participated in the show of force compelling compliance thereof.

368)     Defendants Garegnani's and Lukajic's conduct violated clearly established rights

belonging to Plaintiffs Brandt and Irizarry to the freedom of speech secured by the First

Amendment of the Constitution for the United States which any reasonable Officers in

Defendants' knew or should have known.

369)     Defendants Garegnani and Lukajic engaged in this conduct intentionally, wantonly,

maliciously, knowingly, willfully, recklessly, neglectfully and/or in reckless disregard of-and/or

with deliberate indifference to Plaintiffs' Constitutional Rights.

370)     Defendants' conduct halting Plaintiffs' speech was arbitrary and capricious.

371)     Defendants' conduct forms the direct and proximate cause of injuries sustained by

Plaintiffs.

372)     By halting Plaintiffs speech and forcing them to leave a public building and threatening

to charge them with crimes, Defendants prevented them from speaking on matters of public

concern on a permissible topic with a permissible form of speech, this chilling Plaintiff's

protected speech.

373)     Defendants' malicious prosecutions described herein were part of Denver's customs,

practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

374)        Denver has a custom, practice, or Policy of tolerating violations of the Fourth and

Fourteenth Amendments of the Constitution for the United States, particularly condoning

malicious prosecutions initiated by Officers without probable cause.

375)        Denvers' customs, policies, and/or practices were the moving force behind Defendants

violations of Plaintiffs' Constitutional Rights.

## SECOND CLAIM FOR RELIEF

## 42 U.S.C. §1983-UNREASONABLE SEIZURES #1 FOURTH

## AMENDMENTVIOLATIONS

## PLAINTIFFS IRIZARRY & BRANDT AGAINST DEFENDANTGAREGNANI

376)        Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth

herein.

377)        At all times relevant to this claim, Defendant Garegnani, was acting under the full

color of State Law.

378)        Defendant Garegnani applied physical force to Brandt, and then to Irizarry, with the

stated objective to seize dominion over their freedoms of movement and relocate them each

outside the building.

379)        Garegnani did not at any time have probable cause or any other legally valid basis to

believe Plaintiffs had committed or were committing any violation of the Law prior to seizing

them and relocating their persons outside.

380)        Garegnani did not at any time have any reasonable basis for believing that Plaintiffs

were engaged in conduct which interfered with the ability of Employees to carry out the

business of the Courts or the ability of other persons to effectively access the Courts.

381)        Garegnani did not have any objective reasonable belief that Plaintiffs were engaged in

obscene communication.

382)      Garegnani did not at any time have any warrants authorizing any such seizures of

Plaintiffs bodies.

383)      Gregnani unlawfully seized Brandt and Irizarry without probable cause to believe they

had committed any crime.

384)      No legally recognizable exigent circumstances existed which would have justified or

permitted Defendant Garegnani's conduct.

385)      Garegnani's actions were objectively unreasonable in light of the circumstances

confronting him at the time.

386)      Defendant Garegnani engaged in his conduct applying physical force to seize

Plaintiffs and relocate them outside was strictly based on Plaintiffs exercise of their First

Amendment Rights.

387)      It was Garegnani's stated intention that he would "put my hand on you and guide you

out," and then he did so.

388)      It was Garegnani's stated reason to seize Plaintiffs, wrongfully, that their production

of a middle-finger gesture constituted an "Obscene gesture" in violation of 18-9-111 (1)(b).

389)      Garegnani's conduct seizing Plaintiffs and removing them from the building without

probable cause they were engaged in criminal activity, violated Plaintiffs clearly well

established rights to be free from unreasonable seizures secured for them by the Fourth

Amendment to the Constitution for the United States.

390)      Garegnani's conduct herein would chill a person of ordinary fortitude from engaging

in similar speech, and did chill Plaintiffs.

391)      Garegnani engaged in this conduct intentionally, maliciously, wantonly, knowingly,

willfully, recklessly, neglectfully, and/or in reckless disregard of -and/or with deliberate

indifference to Plaintiffs Constitutional Rights.

392)      Garegnani's conduct herein forms the direct and proximate cause of Plaintiffs' injuries suffered not limited to fear, anxiety, Constitutional violations, loss of sense of security, mental pain and suffering, among other injuries, damages, or losses.

393)      Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

394)      Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning malicious prosecutions initiated by Officers without probable cause.

395)      Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

396)

### THIRD CLAIM FOR RELIEF

### 42 U.S.C. §1983-FIRST AMENDMENT VIOLATION RETALIATION FOR FREE SPEECH #1

### PLAINTIFFS IRIZARRY & BRANDT AGAINST DEFENDANT GAREGNANI

397)      Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

398)      At all times relevant to this claim, Defendant Garegnani was acting under the Full Color of State Law.

399)      Plaintiffs Brandt and Irizarry were engaged in First Amendment protected activity speaking on matter of public concern on an otherwise permissible subject matter using an otherwise permissible form of speech at an otherwise permissible time and location without interfering with Judicial operations, and did not violate any Law or Regulation.

400)     Garegnani responded to Plaintiffs' First Amendment-protected speech with retaliation.

401)     Garegnani's retaliatory actions were substantially, if not entirely, motivated by Plaintiffs' First Amendment Rights.

402)     Garegnani's retaliatory actions were substantially, if not entirely, motivated by his preconceived bias against Plaintiffs' past exercise of protected First Amendment activities.

403)     Garegnani's retaliatory actions were substantially, if not entirely, motivated by his belief Plaintiffs were "Members of Occupy Denver".

404)     Garegnani sought to deter Plaintiffs, and others, from engaging in similar future expression and to stop Plaintiffs from speaking at the time, by punishing them for directing middle-finger gestures in his direction.

405)     Garegnani's retaliatory actions halting Plaintiffs' speech, physically expelling Plaintiffs from the public facility, and threatening them with arrest would chill and deter a person of ordinary firmness from engaging in First Amendment-protected activity.

406)     As Garegnani was escorting Brandt out of the building, Caryn Sodaro said, "Oh, I'm afraid to lift my finger.  I'm afraid of reprimand if I lift my finger."

407)     None of those involved have ever dared to show Garegnani a middle finger in the corridor again, to this day.

408)     Thus, Garegnani's retaliatory actions in fact did chill First Amendment activity.

409)     Garegnani's conduct violated clearly established Rights belonging to Brandt and Irizarry to be free from Governmental Official retaliation for speech in violation of the First Amendment of the Constitution for the United States, which any reasonable Officer in Garegnani's position knew, or should have known for almost Two decades.  (Worrell v. Henry, 219 F.3d 1197.1212 10th Cir. 2000).

410)     Garegnani engaged in this sinister conduct intentionally maliciously, wantonly, knowingly, willing, recklessly, negligently, and/or in reckless disregard of - and/or with

deliberate indifference to-Plaintiffs' Constitutional Rights.

411)      Defendant's conduct caused, directly and proximately, Plaintiffs to suffer damages.

412)      But for Brandt and Irizarry having silently displayed middle finger gestures at Deputy

Garegnani, he would not have engaged in his retaliatory conduct.

413)      Defendants' malicious prosecutions described herein were part of Denver's customs,

practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

414)      Denver has a custom, practice, or Policy of tolerating violations of the Fourth and

Fourteenth Amendments of the Constitution for the United States, particularly condoning

malicious prosecutions initiated by Officers without probable cause.

415)      Denvers' customs, policies, and/or practices were the moving force behind Defendants

violations of Plaintiffs' Constitutional Rights.

416)

## FOURTH CLAIM FOR RELIEF

## 42 U.S.C. §1983-4th, 5th, 14th AMENDMENTS

## FABRICATED EVIDENCE FIRST, FOURTH, FIFTH, AND FOURTEENTH

## AMENDMENTS.

## PLAINTIFFS IRIZARRY & BRANDT AGAINST DEFENDANTS GAREGNANI,

## LUKAJIC & DENVER

Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

417)      At all times relevant to this Complaint, Defendants Garegnani and Lukajic were acting

under the Full Color of State Law.

418)      Lukajic knew his oral reports to fellow

419)      Deputies and Denver Police Officers, and his written official report, were fictitious when

he uttered them.

420)     Garegnani knew his oral reports to fellow Officers, and to Denver Police Officers, and his written official reports, and ultimately his testimony under oath, were fictitious when he uttered them.

421)     Defendants' false statements constituted fabricated evidence which they knew was material to the decisions to arrest, confine, prosecute, and to continue the prosecutions of Brandt and Sodaro.

422)     Defendants knew that any person hearing or reading their false utterances would vilify Irizarry, Brandt, and Sodaro, and would impune them with criminal conduct, and would cause any reasonable third party to harbor a lower opinion of their social, and moral character and reputation.

423)     Defendants intended for their fraudulent statements to injure Plaintiffs reputations when they published them.

424)     Defendants knew their false claims would deny Brandt and Sodaro from accessing Courthouse services which they otherwise had the right to access.

425)     Defendants knew their conjured evidence would likely result in the arrests and prosecutions of Brandt and Sodaro.

426)     Garegnani and Lukajic were acting in official capacity as complaining witnesses when they made their false reports to fellow Officers and their official reports.

427)     Garegnani testified under oath at a Pre-Trial Hearing as a complaining witness 2021 March 24.

428)     It was Defendants' fraudulent statements and testimony that formed the basis for Plaintiffs' arrests, confinements, and prosecutions.

429)     Denver Police and Prosecutors made their decisions to arrest, initiate criminal proceedings and prosecute Brandt and Sodaro based upon Defendant Officers concealment and

misrepresentation and fabrication of material facts given to them by Defendants GAregnani and Lukajic.

430)    Defendants' lies constituted egregious conduct which tainted and perverted the course of Justice victimizing Plaintiffs.

431)    Once Prosecutors became aware that Defendants procured baseless prosecutions, all charges against Brandt and Sodaro were dismissed.

432)    Because Garegnani and Lukajic prosecuted baseless arrests and prosecutions against Brandt and Sodaro through false statements, they are not entitled to immunity.

433)    That an Officer tendering false testimony as a Pre-Trial proceeding as a complaining witness is not entitled to witness immunity has been clearly well established in the 10th Circuit for nearly three Decades. (See Anthony V. Baker 955 F.2d1395 CA10 COLO 1992)

434)    In the 10th Circuit, Officers who fabricate evidence "cannot hide behind the officials whom they defrauded ", and become inextricably liable for the injuries resulting from their misconduct. (See 895 F.2d 649 Robinson v. Maruffi CA10 NM 1990)

435)    Defendant's conduct was arbitrarily, capricious, and conscience shocking.

436)    Defendant's conduct was in retaliation for Plaintiffs' speech both in the past and on 2019 December 11.

437)    Defendants' conduct violated Plaintiffs' clearly well established fight to be free from unreasonable searches and seizures secured by the Fourth Amendment, their rights to not be maliciously prosecuted without the due processes of Law secured by the Fourth, Fifth and Fourteenth Amendments, to enjoy the fundamental and substantive due processes of Law secured by the Fourth, Fifth and Fourteenth Amendments, and to be free from official oppression secured by the First Amendment, which any Officers in their positions knew or should have known.

438)    Defendants' conduct forms the direct and proximate causes of Plaintiffs' injuries not

limited to fear, anxiety, Constitutional violations, loss of sense of security, extreme emotional distress, mental pain and suffering, loss of Liberty, economic losses, loss of opportunities, and other injuries, damages or losses.

439)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

440)     Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning malicious prosecutions initiated by Officers without probable cause.

441)     Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

442)

## FIFTH CLAIM FOR RELIEF

## 42 U.S.C. §1983-FOURTH AMENDMENTS VIOLATIONS UNREASONABLE SEIZURES AND SEARCHES #2

## PLAINTIFFS BRANDT AGAINST DEFENDANTS GAREGNANI AND LUKAJIC

443)     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

444)     At all times relevant to this claim, Defendants Garegnani and Lukajic were acting under Full Color of State Law.

445)     Garegnani and Lukajic are Law Enforcement Officers employed by the City and County of Denver.

446)     Defendants published verbal and written reports to fellow Officers Denver Police Lt. Chavez, Sgt. Lucero, Cpl. Aitken-Nelson , and Officer Morton, among others.

447)     Defendants specifically reported to those Officers that Brandt and Sodaro had committed the crime of Trespass when they re-entered the Courthouse at 10:30am after being told they could not return for the rest of the day.

448)     Based on those fraudulent reports, Denver Police concluded probable cause existed to arrest Brandt the following morning 2019 December 12, and book him into the Denver Detention Center.

449)     During Brandt's arrest and booking, his person, clothing and belongings were searched.

450)     Brandt gave no consent to searches or seizures.

451)     Defendant's fraudulent reports also formed the basis for those Denver Police Officers to obtain an arrest warrant for Caryn Sodaro, also charging her with 38-115 D.R.M.C-Trespass.

452)     On 2019 December 16, DPD executed Sodaro's arrest warrant, arresting her, and booking her into the Denver Jail.

453)     During Sodaro's arrest and booking, Officers searched her person and her belongings.

454)     Sodaro gave no consent to searches or seizures.

455)     Brandt and Sodaro were each required to post monetary bonds to secure their releases from Jail.

456)     Brandt and Sodaro each spent Two days in custody prior to their releases.

457)     Defendants knew Denver Police would believe their statements and rely upon them as fellow Officers.

458)     Denver Police had no reason to believe Defendants reports that Brandt, Sodaro and Irizarry had each been independently told they could not come back were also the fraudulent statements that they were.

459)     Denver Police had no reason to believe that Defendants reports that Brandt and Irizarry had been kicked out for yelling and screaming and causing disturbances were also the lies that they were.

460)      Had Defendants not published their multitude of false statements about the incidents, Denver Police would not have seized or searched or booked Brandt or Sodaro.

461)      Defendants conjured up facts to create the illusions of probable cause with the malicious intentions to cause the foreseeable consequences that Brandt and Sodaro would be arrested.

462)      Plaintiffs' arrests were the probable consequences of Defendants deceptions.

463)      Officials who deliberately or recklessly provide false, material information for use in an Affidavit supporting arrest are liable for the resultant Constitutional violations.

464)      Defendants have had "fair warning" that deliberate or reckless falsification of evidence is a Constitutional Violation since at least 1986 (See 359 F.3d 1279 Pierce v. Gilchrist, 10th Cir. 2004).

465)      Defendants' false statements and false official reports created evidence that formed the indispensable bases for the arrests of both Brandt and Sodaro.

466)      The lengths to which Defendants went to fabricate evidence of probable cause to arrest and prosecute Brandt and Sodaro is further evidence that they knew their earlier actions stopping Brandt's and Irizarry's speech and ejecting them from the facility were in violation of their Rights.

467)      Defendants did not have probable cause that Plaintiffs had violated 3-115 D.R.M.C or any other Law when they caused their unreasonable arrests.

468)      Defendants made their false reports, not to bring to justice persons they genuinely believed to have committed a crime, but rather to punish Brandt, Irizarry and Sodaro for their protected speech.

469)      Defendants objected to Plaintiffs and their associates' past and present speech.

470)      By falsifying evidence to impune Plaintiffs had engaged in criminal conduct, Defendants caused injury which would chill a person of ordinary fortitude from engaging in similar protected speech for fear of trumped up arrests and prosecutions.

471)     Defendants engaged in this conduct with malice.

472)     Defendants engaged in this conduct intentionally, maliciously, wantonly, knowingly, willfully, recklessly, neglectfully, and/or in reckless disregard of- and/or with deliberate indifference to-Plaintiffs clearly established rights to be free from unreasonable searches and/or seizures secured for them by the Fourth Amendment to the Constitution for the United States.

473)     Garegnani's and Lukajic's false statements cause Plaintiffs' injuries, directly and proximally, not limited to fear, anxiety, extreme emotional distress, mental pain and suffering, loss of enjoyment of life, loss of sense of security, delay in lining Brandt's Mother at her hospital bedside, loss of individual dignity, loss of reputation. loss of Liberty, and other injuries, losses and damages.

474)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

475)     Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning malicious prosecutions initiated by Officers without probable cause.

476)     Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

## CLAIM FOR RELIEF 42 U.S.C. §1983-FIRST AMENDMENT JO #19-1 IS VOID FOR VAGUENESS AND VOID FOR OVERBREADTH

## PLAINTIFFS IRIZARRY & BRANDT AGAINST DEFENDANT CITY AND COUNTY OF DENVER

Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

477)     Joint Order JO #19-1 is unconstitutionally overbroad in violation of the First Amendment (See Gooding, 405 U.S. at 518).

478)     JO #19-1 is not narrowly tailored to achieve any significant Government interest.

479)     JO #19-1 fails to leave open ample opportunities and alternatives for First Amendment expression.

480)     JO #19-1 sweeps within its ambit a broad swath of First Amendment protected expressive conduct, including Plaintiff, and more.

481)     JO #19-1 formed the indispensable justification for Defendants' decision to eject Brandt and Irizarry.

482)     JO #19-1 formed the indispensable justification to arrest, jail and prosecute Brandt.

483)     The prohibitions of JO #19-1 are vague and not clearly defined. (See Gooding, 405 U.S. at 518).

484)     JO #19-1 offers no clear and measurable standard by which Plaintiffs and others can act lawfully.

485)     JO #19-1 does not provide explicit standards for application by Law Enforcement Officers.

486)     JO #19-1 fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits, and authorizes, or encourages arbitrary and discriminatory enforcement or both.

487)     Defendants conduct, actions, andor omissions enforcing JO #19-1 caused directly and proximally, Plaintiffs to suffer damages.

488)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

489)     Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning

malicious prosecutions initiated by Officers without probable cause.

490)     Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

## SIXTH CLAIM FOR RELIEF

## 42 U.S.C. §1983-FOURTH AMENDMENT VIOLATIONS MALICIOUS PROSECUTIONS PLAINTIFF BRANDT  AGAINST DEFENDANTS GAREGNANI AND LUKAJIC

491)      Plaintiffs hereby incorporate all other paragraphs of the Complaint as if fully set forth herein.

492)      At all times relevant to this claim, Defendants Garegnani and Lukajic were acting in Full Color of State Law.

493)     Garegnani and Lukajic conjured up the facts which were relied upon as the basis for initiating criminal prosecutions against Brandt and Sodaro for trespass without any legitimate basis for probable cause to believe Plaintiffs had committed any crime.

494)     No probable cause supported Plaintiffs original arrests, confinement, or prosecution.

495)     Defendants Garegnani, Lukajic and Denver were motivated by sinister motives other than to bring to justice persons thought to have committed a crime, but rather to punish them for past and instant criticism, both individually, and for their associations with so-called "Occupy Denver."

496)     Defendants acted with malicious motives in initiating criminal charges against Brandt and Sodaro and in their continued prosecution.

497)     Defendants conduct herein was part of their improper scheme to deter future criticism by these Plaintiffs and anyone else who would dare to engage in similar First Amendment

protected activities.

498)     Defendants actions and omissions constituted conduct in which they engaged intentionally, wantonly, maliciously, knowingly, willfully, recklessly, negligently, and/or in reckless disregard of-and/or with deliberate indifference to-Plaintiffs clearly well established Rights secured for them by the Fourth and Fourteenth Amendments to the Constitution for the United States of America to be free from unreasonable searches and seizures and to not be deprived of Life, Liberty or Property without the due processes of Law which any reasonable Officers in their positions confronted with these circumstances knew or should have known.

499)     Defendant Garegnani further promoted these prosecutions by delivering dozens of false and material statements under oath 2021 March 24.

500)     Brandt's and Sodaro's charges were dismissed after the Prosecution became aware of the recorded evidence showing Defendants' reports to be factitious and fabricated and Garegnani's testimony to be perjurious.

501)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

502)     Defendants conduct forms the legal direct and proximate cause of Plaintiff's unconstitutional and malicious prosecutions.

503)     Plaintiffs Brandt and Sodaro suffered injuries not limited to humiliation, emotional distress, mental pain, anguish and suffering, loss of sense of security, loss of enjoyment of life, loss of liberty and other significant injuries, damages and losses.

504)     The original criminal actions against Brandt and Sodaro were terminated in their favor under facts and circumstances indicative of their innocence.

505)     Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning malicious prosecutions initiated by Officers without probable cause.

506)      Denvers' customs, policies, and/or practices were the moving force behind Defendants

violations of Plaintiffs' Constitutional Rights.

507)      Because Defendants engaged in their conduct with malice with a reckless or wanton

disregard of Plaintiffs' Constitutional Rights, Plaintiffs are entitled to punitive damages.

508)      Garegnani's and Lukajic's fabricated statements had the foreseeable and probable direct

consequences of resulting in Brandt's and Sodaro's arrests and continued prosecutions.

509)      Garegnani and Lukajic are liable for the probable consequences of their false statements.

510)      But for Garegnani's and Lukajic's conjured accounts, Plaintiffs would not have been

arrested or prosecuted.

511)      Garegnani's and Lukajic's extraordinary efforts to give false oral and written reports,

and Garegnani's false testimony, demonstrate that they knew their actions to silence and remove

Brandt and Irizarry earlier were in violation of their clearly established right to free speech and

to be free from unreasonable seizures.

512)      Garegnani and Lukajic knew they would need to secure criminal convictions to insulate

themselves from the Litigation threatened by Brandt and Irizarry.

513)      Garegnani and Lukajic sought to insulate themselves from Civil Liability and

consequences of their misconduct by filing and publishing false statements, which formed the

indispensable basis of Brandt's and Sodaro's arrests and prosecutions.

514)      Defendants were on notice that fabricating evidence to support arrests and prosecutions,

constituted violations of Brandt's and Sodaro's clearly well established rights to be free from

unreasonable seizures and searches secured for them by the Fourth Amendment to the

Constitution for the United States and to not be deprived of life, liberty of property without the

due processes of Law.

515)      Defendants have been on "Fair Notice" that falsifying evidence violates these rights in

the Tenth Circuit for decades.

516)     Defendants Garegnani's and Lukajic's conduct herein to cause Brandt's and Sodaro's malicious prosecutions to be initiated and sustained, were arbitrary and capricious.

517)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

518)     Denver has a custom, practice, or Policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning malicious prosecutions initiated by Officers without probable cause.

519)     Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

## SEVENTH CLAIM FOR RELIEF

## 42 U.S.C. §1983-FIRST AMENDMENT RETALIATION FOR SPEECH #2

## PLAINTIFFS IRIZARRY &  BRANDT AGAINST ALL DEFENDANTS

520)     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

521)     At all times relevant to this Complaint, Defendants Garegnani, Lukajic and Denver were acting under Full Color of State Law.

522)     Plaintiffs had been engaged in First Amendment-protected expression.

523)     Plaintiffs Brandt, Irizarry  had engaged in expression on matters of public concern and did not violate any Law.

524)     Defendants Garegnani and Lukajic responded to Plaintiffs' protected speech with retaliatory conduct.  To wit, they published false verbal reports, and filed falsified official written reports which defamed Plaintiffs and imputed them with having engaged in criminal activity, and caused the arrests and invitations of criminal prosecutions against Brandt .

525)     Defendants Garegnani and Lukajic engaged in their actions and omissions constituting

conduct in a group effort to violate Irizarry's, Brandt's and Sodaro's clearly well established

right to be free from official oppression in retaliation for speech.

526)     Defendants engaged in their retaliatory conduct with ulterior purposes to punish

Plaintiffs for speech critical of their official conduct both in the past, and also inside and outside

(especially) on 2019 December 11, to punish Plaintiffs for their associations with so called

"Occupy Denver Members," to deter Plaintiffs and others from engaging in similar expressive

conduct, and to insulate themselves from discipline and civil liabilities.

527)     Defendants engaged in their retaliatory conduct with malicious motives other than a

desire to bring to justice persons they reasonably believed to have committed a crime.

528)     But for Defendants' preconceived biases against Plaintiffs for their past speech and

associations, and/or their critical speech prior to Defendants retaliatory conduct described in

Claim III, and/or their highly critical speech after leaving the building.  Defendants would not

have engaged the adverse actions described herein.

529)     Plaintiffs' protected actions were the substantial motivating factor in Defendants'

adverse actions.

530)     Retaliatory conduct need not independently violate a Federal Right, but merely need to

have a deterrent effect on speech; adverse action need merely be sufficient to risk self-

censorship.

531)     Indeed, Sodaro expressly censored significant speech on matters of public concern

stating her fear of reprimand.

532)     Plaintiffs were deterred from future speech.

533)     Defendants conduct was in bad faith, fraudulent, deceitful, dishonest, trickery, unfair,

and designed to obtain advantages over Plaintiffs.

534)     Defendants' adverse actions lacked any probable cause whatsoever.

535)     The deterrent effect on speech need not be great to be actionable in a First Amendment retaliation claim.

536)     It has been clearly well established that Plaintiffs enjoy the right to be free from official retaliations in the Tenth Circuit for more than Two decades.  (See 219 F. 3d 1197 Worrel v. Henry)

537)     Garegnani unlawfully prevented Brandt and Sodaro from entering the Courthouse without the lawful justification to do so.

538)     Sodaro and Brandt had clearly well established rights to access an open Courthouse.

539)     Brandt had a clearly well established right to appear before the Court for his docket.

540)     Garegnani has admitted that he knew Brandt, like anyone, was likely to have an arrest warrant issued where he failed to appear before a Judge when directed to do so.

541)     Trespassing Brandt and Sodaro constituted adverse conduct capable of deterring speech.

542)     Restricting Brandt's and Sodaro's Freedom of Movement constituted adverse conduct capable of deterring speech.

543)     Garegnani and Lukajic's false statements to fellow Officers, false written reports, and Garegnani's perjurious testimony, constituted adverse conduct capable of deterring speech.

544)     Defendants' fabricated quotes of outrageous incendiary and vile insults attributed to Irizarry, Brandt and Sodaro, constituted defamation of Character per se which would cause any reasonable person hearing or reading them to think less of their characters.

545)     Defendants' false statements impugning Plaintiffs with criminal conduct constituted further defamation.

546)     Defendants published these false statements and would lead persons of ordinary intelligence to believe Plaintiffs were blameworthy, and criminals.

547)     Defendants' fabricated statements took from Plaintiffs their reputations.

548)     Defendants' false statements were untrue, caused Plaintiff's injuries, and were published

maliciously, constituting injurious falsehood.

549)       Defendants' adverse actions were substantially motivated by bias against so-called "Occupy Denver" which would deter people from associating those who might share or espouse similar political ideals.

550)       Plaintiff Irizarry, in particular, did not even live in Colorado when the Occupy Denver movement was popular; thus accusing him of being a "member" of "Occupy Denver" in the public record, changes Irizarry's political status.

551)       Defendants engaged in class discrimination by retaliating against Plaintiffs for associating with "Occupy Denver," or Defendant's belief thereof.

552)       Defendants' false conjured facts causing Brandt and Sodaro to be arrested, searched and prosecuted, constitutes adverse action capable of deterring speech.

553)       Defendants abused the criminal process of the Courts to punish their long-time critics.

554)       Defendants admit their long-standing experience with Plaintiffs (and "Occupy Denver").

555)       There is direct causal connection between Plaintiffs past expressive activity, their instant speech, and their protests outside the building and Defendants array of retaliatory adverse conduct.

556)       Defendants' adverse conduct would chill a person of ordinary firmness from engaging in similar expressive activity.

557)       Courts have held that filing false reports in response to protected speech activity constitutes retaliation in violation of the First Amendment.

558)       Following this date, Garegnani has continued to taunt Plaintiffs.

559)       On one occasion, Brandt was remanded by Garegnani from Courtroom 4H. After handcuffing Brandt and taking him alone into the adjacent sally port, Garegnani roughly pushed Brandt into the wall and whispered into his ear "I'm gonna teach you a new definition of the word "Checkmate."

560)     On other occasions, Garegnani would follow Brandt through the hallways and laugh at him, stare him down, and otherwise stack him and intimidate him.

561)     A Law Enforcement Officer stalking, intimidating, and threatening a person in retaliation for critical speech would deter an ordinary person from criticizing Law Enforcement in the future.

562)     Defendants retaliatory actions were substantially motivated by Plaintiffs exercise of First Amendment protected speech.

563)     Defendant Denver has a custom, policy, or practice of tolerating violations of the First Amendment and retaliation for speech.

564)     Denver's customs, policies, and/or practices were the moving force behind Defendants' violations of Plaintiffs' Constitutional Rights.

565)     Defendants engaged in their retaliatory conduct in violation of Plaintiff's clearly well established right to be free from official oppression in retaliation for protected speech secured for them by the First Amendment to the Constitution for the United States, which any officials in their positions knew or should have known.

566)     Defendants acted intentionally, wantonly, maliciously, knowingly, willfully, recklessly, neglectfully, and/or in reckless disregard of- and/or with deliberate indifference to-Plaintiffs' Constitutional Rights.

567)     Defendants' acts and omissions cause Plaintiffs, directly and proximally, to suffer significant injuries, damages, and losses.

568)     Because Defendants acted with malice, Defendants are entitled to punitive damages.

569)     Defendants' malicious prosecutions described herein were part of Denver's customs, practices and policies of prosecuting persons maliciously who criticize Denver's Officials.

570)     Denver has a custom, practice, or policy of tolerating violations of the Fourth and Fourteenth Amendments of the Constitution for the United States, particularly condoning

malicious prosecutions initiated by Officers without probable cause.

571)     Denvers' customs, policies, and/or practices were the moving force behind Defendants violations of Plaintiffs' Constitutional Rights.

## PRAYER FOR RELIEF

572)     Wherefore, Plaintiffs respectfully request this Court enter Judgment in their favors and against Defendants, and Grant:

573)     Appropriate declarative, injunctive, and/or equitable relief;

574)     Enter a declaration that Joint Order JO #1901 is unconstitutional on its face and enjoin its enforcement;

575)     Compensatory and consequential damages, including damages for extreme emotional distress, emotional distress, mental pain and suffering, humiliation, loss of reputation, loss of sense of security, loss of enjoyment of life and other pain, suffering, injuries, damages and losses sustained on all claims as allowed by Law in amounts to be determined at Trial;

576)     All economic losses on al claims allowed by Law;

577)     Punitive damages on all claims allowed by Law and in amounts to be determined at Trial;

578)     Attorney's fees and costs associated with this action, including those associated having to defend against the false criminal charges as well as expert witness fees, on all claims allowed by Law:

579)     Pre-and Post-Judgement interest at the lawful rate;

580)     Enjoin Defendants from class discrimination against so-called "Members of Occupy Denver," or others engaged in related First Amendment protected activities.

581)     Any further relief that this Court deems just and proper, and any other relief as allowed by Law.

582)     Plaintiffs demand a Trial to a Jury on all matters so triable.

Defendants:

Garegnani, Bret DOB: 1983Dec11

Badge# S08048 (11 Yrs. Experience)

Lukajic, Darko DOB: 1990Jan01

Badge# S17056 (2 Yrs. Experience)

Witnesses:

Judge Gary Jackson-Retired

Attorney Mark Burton

Caryn Sodaro

Kyle Shockley

Bruce Langley ?

Johna Solis

Alan Moody

Eric Brandt

Abade Irizarry

Janet Matzen

* Captain Michael Jordan

Badge #S05008 (14 Yrs. Supervisor)

\* Sergeant Edson Valenzuela DSD

DOB: 1970Sep23

13103 Vine Ct., Thornton, Co 80241

## F.    PLAINTIFFS' SIGNATURES

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

 /s/ Abade Irizarry
  (Plaintiff's signature)

 /s/ Eric Brandt
  (Plaintiff's signature)

  December 13th, 2021
  (Date)

(Form Revised December 2017)